IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
PADUCAH DIVISION
CIVIL ACTION NO.   5:25-cv-85-BJB

RAILPROS FIELD SERVICES, INC.,                                                    **Plaintiff,**

    **v.**

**RICHARD BELLEW AND
TRACK TECH, INC.,**                                                                          **Defendants.**

## **COMPLAINT**

RailPros Field Services, Inc., ("RailPros"), for its civil Complaint against Richard Bellew ("Bellew") and Track Tech, Inc. ("Track Tech"), states as follows:

1.  Bellew is the former Chief Safety Officer and Senior Vice President of RailPros. In this capacity, Bellow was responsible for, oversaw, and managed RailPros' On-Track Safety program, including RailPros' Roadway Worker In Charge (RWIC)/Railroad Flagging program.

2.  During his employment, Bellew signed a series of restrictive covenant agreements, including a Class A-1 Option Agreement ("Option Agreement" - Exhibit 1, attached hereto) on June 21, 2021, and a non-disclosures Agreement ("NDA" - Exhibit 2, attached hereto). As more fully described below, pursuant to these Agreements, Bellew agreed not to compete with RailPros and not to solicit RailPros employees or customers for two years after the termination of his employment with RailPros. Bellew further agreed to refrain from any unauthorized use or disclosure of RailPros' Confidential Information.

3.  Bellew separated from employment with RailPros on May 3, 2024. On or about January, 2025, Bellew accepted employment with Track Tech. Track Tech operates from its headquarters in Calvert City, Kentucky. Track Tech is a competitor of RailPros and is in the business of railroad construction and track maintenance, describing itself as "your trusted railroad

construction contractor."[1]  Prior to Track Tech's employment of Bellew in early 2025, Track Tech did not offer On-Track Safety services (including RWIC services).  On or about March 25, 2025, Track Tech announced "a new addition to our suite of railroad services:  On-Track Safety (OTS) Services.  According to Track Tech's announcement: "Our OTS team specializes in providing expert on-track protection services . . ."  Track Tech could not have offered these "expert" OTS services without substantial contributions and assistance from Bellew.

4.      Bellew's employment with Track Tech breaches Bellew's non-competition covenant he entered into with RailPros.

5.      Any direct or indirect involvement by Bellew in Track Tech's new offering of the OTS Services that Bellew oversaw and ran for RailPros further breaches his restrictive covenants with RailPros.

6.      RailPros files this Complaint for breach of contract, seeking equitable relief and damages for Bellew's violations of his restrictive covenants he entered into with RailPros and tortious interference with contractual relationships for Track Tech's continued employment of Bellew.

**PARTIES**

7.      RailPros Field Services, Inc. is a Texas Corporation with its principal place of business in Irving, Texas.  RailPros provides services in multiple states, including Kentucky.

8.      Bellew is an individual citizen and resident of Evanston, Wyoming.  Bellew regularly and routinely transacts business in Kentucky, including on behalf of Track Tech.

9.      Track Tech, Inc. is a Kentucky corporation with its principal place of business in Calvert City, Kentucky.

---

[1] *See,* https://www.tracktechinc.com/, last visited June 16, 2025.

## JURISDICTION AND VENUE

10.    RailPros generates over $75,000 in revenue from its On-Track Safety Services annually.  This business is at risk from a new competitor setting up and operating a directly competing business with the direct or indirect assistance of RailPros' former Chief Safety Officer, Bellew.

11.    The restrictive covenants in the Option Agreement include a provision whereby the period of the restrictive covenants is tolled during any period that Bellew is in breach of the restrictive covenants. (*See*, Exhibit 1, at p. 13.)  When valuing the object of the litigation in a case seeking injunctive relief, the parties may also look to the costs to the defendant of complying with an injunction.  Due to the tolling provision, Plaintiff requests that Bellew be enjoined from working for Track Tech for at least 16 months.  Bellew began breaching the non-competition covenant no later than when he accepted employment with Track Tech in January 2025 – eight months after his two year non-competition covenant began to run.  RailPros paid Bellew an annual base salary of $ $275,017.60.  Upon information and belief, Track Tech is paying Bellew compensation that is substantially equivalent to his compensation from RailPros.  Bellew stands to forfeit well over $300,000 in compensation.

12.    Plaintiff is a citizen of Texas. Defendant Bellew is a citizen of Wyoming. Defendant Track Tech is a citizen of Kentucky.

13.    This Court has complete diversity jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because it involves an amount in controversy that exceeds $75,000.00, exclusive of interest and costs, and is between citizens of different States.

14.    Venue is proper in this District because Defendant Track Tech is a resident of this Division and District, the facts giving rise to the claims and causes of action alleged herein, in

whole or in substantial part, occurred in this District, including that Bellew's employment with Track Tech and his activities for Track Tech that breach his Agreements with Plaintiff have occurred and continue to occur in this Division and District.

15.    This Court has personal jurisdiction over the Defendants as Track Tech is a resident of the Commonwealth of Kentucky and this District and both Defendants regularly transact business within, perform work within, and are engaged in other persistent courses of conduct within the Commonwealth of Kentucky and this District.

## FACTUAL BACKGROUND

16.    RailPros Field Services, Inc. is a wholly-owned subsidiary of RailPros Parent, LLC. RailPros, along with its affiliated entities, is a national premier provider of engineering and diversified safety services to America's rail and transit industry.   RailPros operates in this specialized industry across the United States, including in Kentucky.

17.    RailPros' RWIC services focus on ensuring the safety of workers and the public on and around railroad tracks. RWICs, also known as flagmen or EICs, are responsible for job site coordination, communicating with train dispatchers, and ensuring on-track safety. RailPros provides RWIC services for various railroad projects, including capital projects and maintenance-of-way projects.

18.    RailPros' on-track safety services include proprietary processes.  RailPros has developed its RAILS website, which continues to expand and evolve to meet its customers' needs. The site generates job numbers for each customer project for reference in the RAILS system and stores documents online with easy access for viewing. All billing information is also available in the system for invoicing and other accounting functions. Every update made to a record is timestamped. RailPros continually updates this system and make changes to better serve its

4

customers and all their needs. RAILS also gives RailPros the ability to generate reports for all flagging jobs in the system, including Daily Work Reports (DWR), schedules, field audits, and billing. The RAILS customer portal gives customers access to set up their own account and fill out all information online in the RAILS system to initiate flagging for an upcoming job, then tracks the steps and schedule of each future railroad project.

19.    RailPros' RWICs use a proprietary software application called "On-Track Supplemental Safety" (OTSS) to prevent safety incidents from occurring, such as misplaced flags or flags being left on the right of way, misplaced switch locks, and derails, and also allows lone workers to report on and off duty. RailPros understands the complexity of the RWIC's duties and continues to create more proficient tools and technology to enhance safety and streamline these flagging duties. The OTSS application adds an additional level of roadway worker protection for RailPros employees in the field.

20.    OTSS is also a powerful "no-touch" job briefing tool that digitizes the job briefing process and keeps employees safe. The use of this feature eliminates the need to utilize a pass-around sign-in sheet. Instead, workers scan a QR code generated by our RWIC, which takes them to a secure military-encrypted custom site where they enter their name and number and acknowledge the briefing given to them. Each worker that acknowledges the briefing receives a digital copy that can be referenced in a safe place throughout the day. As activities on the job site change, the briefing is updated with the group and acknowledged accordingly.

21.    On or about August 24, 2020, RailPros promoted Bellew to the position of Senior Vice President Safety and Training. On March 10, 2021, RailPros changed Bellew's title to Senior Vice President and Chief Safety Officer ("CSO"). Bellew remained as CSO and Senior Vice President until the end of his employment with RailPros effective May 3, 2024.

22.    In these roles, Bellew was a nationwide leader of RailPros' On-Track Safety and RWIC services.  Bellew was responsible for numerous aspects of RailPros' On-Track Safety and RWIC services, including training of employees, customer relations, marketing, research and development, and implementations of new technologies.

23.    Bellew provided operational safety and risk oversight for RailPros' On-Track Safety program.  He interacted with customers pursuant to requests for proposals, in response to incidents or accidents, and sold RailPros' safety consulting services.

24.    As a senior executive and officer in charge of RailPros' On-Track Safety and RWIC services, Bellew had access to RailPros confidential, proprietary and trade secret business information, including proprietary and trade secret aspects of the RAILS website and OTSS application, including RailPros' proprietary software, research, development, financial, and marketing information.

25.    During his employment with RailPros, Bellew had substantial contact with RailPros customers.  RailPros provided Bellew with this opportunity and he did in fact develop substantial relationships with Plaintiff's customers throughout the United States.

26.    RailPros has developed special techniques, programs, software, applications, secure customer online portals, websites, training methods, pricing models, and customer-specific knowledge accumulated over many years. Information about specific services, software, pricing, marketing, technology developments, customers, and pricing is closely guarded, confidential business information that could not otherwise be obtained or ascertained by competitors. This information is extremely valuable to RailPros.

27.    As RailPros' Chief Safety Officer, RailPros disclosed all of the confidential, proprietary, and trade secret information described above regarding its On-Site Safety and RWIC

services to Bellew in order for him to perform his duties and lead this segment of RailPros' business.

28.    RailPros' confidential, proprietary, and trade secret information, which is maintained in both electronic and hard copy forms, was compiled through and by the use of RailPros' ingenuity, time, marketing, strategies, pricing, labor, expense, investigation, and experience, rendering the information a vital asset of RailPros.

29.    RailPros takes reasonable steps to protect its confidential, proprietary, and trade secret information, Specifically, RailPros requires individuals such as the Bellew to execute restrictive covenant and non-disclosure agreements.  RailPros has also adopted internal policies and processes wherein confidential, proprietary, and trade secret information is protected from unnecessary disclosure to third parties.  All employees are required to sign a confidentiality agreement as a condition of employment. RailPros utilizes multi-factor authentication (MFA) to protect access to its electronic systems and networks.  All electronic data transfers, whether internally or externally, are tracked. RailPros also uses Mimecast to filter potentially harmful emails.

30.    In or about June, 2021, RailPros, pursuant to the RailPros Parent, LLC 2020 Equity Incentive Plan ("Plan"), provided Bellew with the opportunity to participate in the Plan.  Bellew agreed to enter into the Class A-1 Option Agreement ("Option Agreement").  In consideration for the grant of equity provided to Bellew, he agreed to abide by certain restrictive covenants set forth in the Option Agreement and Exhibit B attached thereto. (*See*, Exhibit 1, at Exhibit B). .  Bellew entered into these Agreements on or about June 21, 2021.

31.    As stated in the Option Agreement and Exhibit B, Bellew agreed to the following relevant provisions:

<u>Restrictive Covenants.</u>

As an inducement and as essential consideration for the Company to grant the Option hereunder, the Participant hereby agrees that, during the Participant's employment or service with the Company and its Subsidiaries and until two (2) years following the termination of the Participant's employment or service with the Company and any of its Subsidiaries for any reason (the "<u>Restricted Period</u>"), the Participant shall not engage in any conduct that violates, and will be bound by and comply with, the provisions of Exhibit B hereto.

* * *

## **<u>EXHIBIT B</u>**

(a)    <u>Non-Solicitation</u> of <u>Employees.</u> Participant hereby agrees, for the Restricted Period not to, directly or indirectly, without the prior written consent of the Board of Directors, which may be granted or withheld by the Board of Directors in its sole discretion, in person or through the assistance of others, knowingly participate in soliciting, communicating with or hiring a Covered Employee (defined below) of the Company for the purpose of persuading the Covered Employee to end or modify the Covered Employee's employment relationship with the Company or to work for another person. As used in this paragraph, "<u>Covered Employee</u>" means any person who is employed by the Company at the time of, or within the twelve (12) months prior to, any such solicitation, communication or hire, as described in this <u>Exhibit A.</u> For purposes of this Agreement, "solicit" and related terms, such as "soliciting" or engaging in "solicitation," mean to engage in contacts, acts, or communications, whether directly engaged in by Participant in person or indirectly engaged in through the use or control of others, that cause or induce, attempt to cause or induce, or can be reasonably expected to cause or induce a "Person" (defined as a natural person, firm, partnership, association, limited liability company, corporation, company, trust or unincorporated organization, or a government or agency or political subdivision thereof) to engage in a particular action or conduct, regardless of who first initiates the contact or communication and/or whether or not the communication at issue is in response to a request for information or not. Nothing herein is intended or to be construed as a prohibition against general advertising, such as "help wanted" ads or online job boards that are not targeted at Covered Employees. For purposes of this Exhibit A, "Company" shall be deemed to include the Company and its direct and indirect subsidiaries and their affiliates.

(b)    <u>Non-Competition.</u> Participant hereby agrees during the Restricted Period not to, anywhere within the "Territory" (defined below), ***directly or indirectly***, without the prior written consent of the Board of Directors, which may be granted or withheld by the Board of Directors in its sole discretion, ***in person or through the assistance of others***, acting individually or as an owner, shareholder, partner, officer, employee, contractor, consultant or agent (other than on behalf of the Company): (i) conduct, manage, operate, engage in, be employed by, have an ownership interest in, participate in the control of or be connected in any manner with a "Competing Business" (defined below) and/or (ii) own, receive or purchase a

8

financial interest in, make a loan to, or make a monetary gift in support of, any Competing Business; provided, however, that Participant may own, directly or indirectly, solely as an investment, securities of any business traded on any national securities exchange, provided that Participant is not a controlling person of, or a member of a group that controls, such business, and further provided that Participant does not, in the aggregate, directly or indirectly, own two percent (2%) or more of any class of securities of such business. "Competing Business" shall mean businesses engaged in the Business. "Territory" shall mean the United States and each additional country (including state and state-equivalents and county and county-equivalents within those countries) in which the Company is engaged in the Business at any time during the Restricted Period. "Business" means the business of (i) providing outsourced safety management, flagging, observer, design, engineering, inspection, site management, program management, utility observation, or training services to rail operators, transportation and transit agencies, contractors, utility companies, state DOTs, or other entities, provided such services are related to rail infrastructure, rail services, or activities occurring adjacent to rail infrastructure, or (ii) any other business that the Company is engaged in as of the termination of Participant's employment with the Company for any reason or any type of business planned in writing or by Board action as of the date of such termination to be entered into by the Company within the following 12-month period.

(c)     Customer Restrictions. Participant hereby agrees during the Restricted Period not to, directly or indirectly, without the prior written consent of the Board of Directors, which may be granted or withheld by the Board of Directors in its sole discretion, in person or through the assistance of others, on behalf of himself/herself/itself and/or a Competing Business, working alone or in conjunction with one or more other persons or entities, for compensation or not: (i) solicit, assist in soliciting, facilitate the solicitation of, provide, or offer to provide services to, any and all customers or referral sources of the Company or any prospective customer or prospective referral source with whom the Company was in contact at any time during the one **(1)** year period prior to the time of such competitive activity (such one (1) year period, with respect to any activity prohibited by this Agreement, as applicable to such activity, the "Look-Back Period") (collectively, a "Covered Customer") for the purpose of providing a Competing Product or Service (as defined below); or (ii) induce or attempt to induce any Covered Customer to withdraw, curtail or cancel its business with the Company or in any other manner modify or fail to enter into any actual or potential business relationship with the Company. "Competing Product or Service" shall mean products or services of a Competing Business.

Option Agreement (Exhibit 1 hereto) at ¶ 7 and Exhibit B (emphasis added).

32.     In or about January, 2025, Bellew became employed with Track Tech as a senior executive.  At the time Track Tech hired Bellew, Track Tech did not offer On-Track Safety or

RWIC services.  Less than two months later, Track Tech announced that it would now be offering On-Track Safety and RWIC services.  According to Track Tech's March 25, 2025 announcement on X (formerly Twitter):

> Breaking News:  Track Tech Expands Service Offerings!
>
> We're excited to officially announce a new addition to our suite of railroad services: On-Track Safety (OTS) Services.
>
> For over 30 years, Track Tech has proudly delivered top-tier turnkey track construction, inspections, and repairs.  Now, we're bringing that same commitment to excellence to Right-of-Way Protection.
>
> Our OTS team specializes in providing expert on-track protection services tailored to meet the safety needs of our railroad partners.  Whether your're an existing client or looking for a trusted new provider, we're ready to support your project with unmatched reliability and professionalism.
>
> We understand you have options when it comes to RWIC services—but once you work with Track Tech OTS, you'll look no further. Privately owned and operated we place safety and service above everything.
>
> Let's keep railroads safe—together.

(*See* Exhibit 3 – Track Tech announcement on X.)

33.     As described above, as RailPros' Senior Vice President and Chief Safety Officer, Bellew was responsible for many aspects of RailPros' On-Track Safety and RWIC programs, including safety training.  Track Tech could not have developed, marketed, and implemented its own On-Track Safety programs without the direct or indirect involvement of Bellew.

34.     Track Tech is a Competing Business as defined in the Option Agreement.  Bellew's employment by Track Tech in any capacity breaches the Non-Competition covenant of the Option Agreement.  Upon information and belief, Bellew is directly or indirectly involved in training for Track Tech – a significant job responsibility he had at Track Tech.  RailPros also understands that Bellew has been and continues to be directly or indirectly involved in the marketing, customer

solicitation, and implementation of Track Tech's On-Track Safety Services and RWIC services, in direct competition with Bellew's primary responsibilities as an officer and executive of RailPros.

35.    As noted above, RailPros provided Bellew with access to all of RailPros' confidential, proprietary and trade secret information regarding its On-Track Safety and RWIC programs.  Upon information and belief, Bellew has, or will inevitably, in the course of his employment with Track Tech, use or disclose RailPros' confidential, proprietary and trade secret information in violation of his legal obligations to RailPros, including as set forth in the NDA.

36.    On April 25, 2025, Plaintiff put Bellew and Track Tech on notice of the Option Agreement and the NDA and that Track Tech's employment of Bellew violated the covenants of those Agreements.  Track Tech has continued to employ Bellew after receiving notice of Bellew's contractual obligations to RailPros.

37.    Track Tech has employed Bellew in a position that allows Bellew to unfairly and unlawfully compete with RailPros, causing injury and damage to RailPros.

38.    Track Tech knows of the existence of the Option Agreement and NDA Bellew has with RailPros and has intentionally permitted and/or encouraged him to breach these Agreements with RailPros in order to gain an unfair competitive advantage over RailPros.

39.    Unless Defendants are restrained or otherwise prevented from unfairly competing against RailPros and misusing the confidential, proprietary, and trade secret information of RailPros, Plaintiff will continue to suffer irreparable harm.

## CAUSES OF ACTION

### COUNT I
### BREACH OF CONTRACT
**(against Bellew)**

11

40.    The allegations contained in Paragraphs 1-39 are incorporated herein by reference.

41.    The Option Agreement and the NDA Agreements with Bellew provide sufficient consideration – including, but not limited to, Bellew's employment, equity options, and/or RailPros' disclosure of its confidential, proprietary, and trade secret information – for Bellew's promises and acknowledgements contained in the Option Agreement and NDS including his acknowledgements and promises not to compete against RailPros, not to solicit RailPros' customers, and not to misuse or disclose RailPros' Confidential Information.

42.    The Option Agreement and NDA constitute valid, enforceable contracts supported by adequate consideration.  The restrictive covenants are reasonable and no greater than necessary to protect and preserve RailPros' legitimate protectable interests, including as to the reasonableness of the time and territorial restrictions.

43.    RailPros has performed its obligations to Bellew under the parties' Agreements, including granting of equity options, employment, and access to confidential, proprietary, and trade secret information.

44.    Bellew, as alleged above, has failed to perform his obligations to RailPros under the Option Agreement and NDA and has breached and is currently breaching these Agreements.

45.    Plaintiff has sustained actual, contractual and consequential damages in an amount to be determined at trial as a result of Bellew's breach of his Agreements.

**COUNT II**
**REQUEST FOR SPECIFIC PERFORMANCE**
**(against Bellew)**

46.    The allegations contained in Paragraphs 1-45 are incorporated herein by reference.

47.     Bellew's violation of his Agreements has caused and is causing irreparable and continuing harm to RailPros, and for which RailPros has no adequate remedy at law.  RailPros will continue to sustain such harm unless the Option Agreement and the NDA are enforced.

48.     The harm to RailPros, if specific performance does not issue, is greater than the harm to Defendant Bellew if it does, and the public interest will not be affected by the grant of specific performance.

49.     Accordingly, this Court should enter an order for specific performance directing Defendant Bellew to refrain from maintaining any role or providing any services to Plaintiff's direct competitor, Track Tech, and to otherwise honor his obligations in his Agreements, including to not directly or indirectly solicit any of Plaintiff's customers or employees and to protect and return any of Plaintiff's Confidential Information.

## COUNT III
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (against Track Tech)

50.     The allegations contained in Paragraphs 1-49 are incorporated herein by reference.

51.     As discussed above, RailPros maintains contractual relationships with Bellew, in exchange for valid consideration, Bellew agreed to certain post-employment obligations concerning direct and indirect competition against RailPros, as well as agreeing to return RailPros' confidential information.

52.     Upon information and belief, Track Tech was aware of these Agreements at the time it hired Bellew. At a minimum, it became aware of these Agreements when it received and subsequently responded to correspondence from RailPros' counsel.

53.     Track Tech has acted intentionally to improperly interfere with RailPros' contractual relationships with Bellew. Track Tech has directly or indirectly facilitated or otherwise

encouraged Bellew to breach his contractual relationships with RailPros by hiring him, and upon information and belief, has utilized, directly and/or indirectly, his expertise (and RailPros' confidential information) in On-Track Safety programs that he obtained while at RailPros to set up and operate Track Tech's On-Track Safety Services and RWIC services.

54.     Track Tech's conduct was done with the motive and/or means to harm RailPros' contractual relationships and RailPros' business and RailPros has been harmed.

55.     Track Tech has no privilege or justification to excuse its conduct.

56.     Plaintiff seeks injunctive relief and compensatory and punitive damages in an amount to be proved at trial.

WHEREFORE, Plaintiff prays for relief as follows:

a)     That this Court take jurisdiction of the parties and the subject matter hereof;

b)     That judgment be entered for Plaintiff and against Defendants granting equitable relief of specific performance, including an order enjoining Bellew for the full duration of the restrictions from further conduct constituting breach of his Agreements.

c)     That the court order Defendants to cease any use or disclosure of (and to return to Plaintiff) any of Plaintiff's confidential information and company property in their possession.

d)     That judgment be entered for Plaintiff and against Defendants for compensatory, consequential, and punitive damages, and pre- and post-judgment interest in an amount to be ascertained and established at trial;

e)     That Plaintiff be awarded its reasonable attorneys' fees and litigation costs and have such other and further relief as the Court may deem just and proper.

Dated this 17th day of June, 2025.

OGLETREE, DEAKINS, NASH, SMOAK & STEWART, P.C.

By: */s/ Rita B. Robertson*
Rita B. Robertson, KY Bar No. 99840
8529 Six Forks Road, Forum IV, Suite 600
Raleigh, NC 27615
Telephone: 919-760-3338
rita.robertson@ogletree.com

William S. Rutchow (*pro hac vice forthcoming*)
Truist Plaza, Suite 1200
401 Commerce Street
Nashville, Tennessee 37219
Telephone: 615.254.1900
william.rutchow@ogletree.com